**ALADDIN'S CASTLE, INC., Plaintiff–Appellant, Cross–Appellee,**

v.

**The CITY OF MESQUITE, Defendant–Appellee, Cross–Appellant.**

No. 77–2990.

United States Court of Appeals, Fifth Circuit.

Nov. 17, 1980.

Rehearing and Rehearing En Banc Denied Dec. 15, 1980.

---

Thomas L. Case, Louis P. Bickel, Dallas, Tex., for plaintiff–appellant, cross–appellee.

Elland Archer, City Atty., Mesquite, Tex., for defendant–appellee, cross–appellant.

Before AINSWORTH, VANCE and ANDERSON, Circuit Judges.

VANCE, Circuit Judge:

This case arises from Aladdin's Castle, Inc.'s attempt to operate a coin–operated amusement center in Mesquite, Texas. Two questions dominate these appeals. First, did the district court correctly rule that Mesquite's licensing statute for owners of coin–operated amusement centers was unconstitutionally void for vagueness? Second, did the district court properly sustain as constitutional a Mesquite ordinance which barred individuals under seventeen years of age from entering such establishments to operate the machines unless accompanied by an adult? We affirm on the vagueness issue. We reverse on the age limitation issue and remand for further proceedings consistent with our opinion.

## I. FACTS

Aladdin's Castle, Inc.[1] owns and manages approximately one hundred family amusement centers throughout the United States, including three centers in Texas. Typically located in suburban shopping areas, each Aladdin's center contains a variety of coin–operated amusement devices. Adults run and supervise the patrons' use of these centers. Their duties include the enforcement of Aladdin's rules prohibiting loitering, gambling, smoking, and the consumption of food, nonalcoholic drinks and alcoholic beverages on the premises. These rules exist in all such centers operated by Aladdin's. Aladdin's Castle also enforces a rule that bars school children from the establishment during school hours.

Approximately five years ago, Aladdin's began discussions with Homart, Inc., a subsidiary of Sears Roebuck and Co., concerning the possibility of opening a coin–operated family amusement center in the Town East Mall that Homart was developing in Mesquite. During these negotiations, Aladdin's discovered two legal obstacles to the proposed deal. First, the Town East Mall was not properly zoned for Aladdin's proposed business use. Second, Mesquite had an ordinance, No. 1103, prohibiting children

1. Aladdin's Castle, Incorporated was formed by Jules Millman in 1969. Aladdin's stock was sold in April 1974 and is now owned by Bally Manufacturing Corporation, a publicly held corporation that is listed on the New York Stock Exchange.

under the age of seventeen from playing coin–operated games.[2]

After making these discoveries, representatives of Aladdin's attended a meeting of the Mesquite City Council. Aladdin's expressed its interest in opening an amusement center in Town East. It asked whether the city would change its zoning to allow Aladdin's to do business in the Town East Mall and whether the city would remove ordinance No. 1103, which restricted children and young adults from using coin–operated products and games. Aladdin's informed the council that unless the age restriction was revoked it could not open a profitable center. After considering the manner in which Aladdin's operated its amusement centers, the city council agreed to Aladdin's requests. The council explicitly encouraged Aladdin's investment in Mesquite, although it noted that Aladdin's would not be issued a license until it had finished building its store.

On April 5, 1976, Mesquite passed two ordinances pursuant to Aladdin's requests.

**2.** ORDINANCE NO. 1103

*SECTION 3.* It shall be unlawful for any owner, operator or displayer of coin–operated amusement machines to allow any person under the age of seventeen (17) years to play or operate a coin–operated amusement machine unless such minor is accompanied by a parent or legal guardian.

**3.** ORDINANCE NO. 1314

*SECTION 1.* That the Comprehensive Zoning Ordinance of 1973, duly passed by the City Council of the City of Mesquite, Texas, on the 4th day of September, 1973, be, and the same is, hereby amended by amending the Zoning Map of the City of Mesquite so as to grant a conditional use designation for an indoor commercial recreation for coin–operated amusement machines within the Town East Mall with the stipulations that the operation is to be conducted as presented at the public hearing; otherwise the license would be withdrawn; other stipulations shall include that supervisors, age 25 years or older, approved by the Chief of Police, shall be on duty at all times, and that there shall be no sale or consumption of food or drink, and smoking and gambling shall not be allowed on the premises . . . .

**4.** ORDINANCE NO. 1310

Ordinance No. 1314 amended Mesquite's comprehensive zoning ordinance to authorize the establishment of a coin–operated amusement center at Town East Mall.[3] Ordinance No. 1310 amended ordinance No. 1103 to permit children to utilize coin–operated amusement devices in certain establishments.[4] The features of such establishments were defined in terms of Aladdin's own policy and rules. The exempted amusement centers should, *inter alia*, be located in an enclosed shopping mall and must not "offer for sale or allow the consumption of food, drink or other merchandise." Ordinance No. 1310. The zoning change, likewise, incorporated Aladdin's council presentation: "the operation is to be conducted as presented [by Aladdin's] at the public hearing." Ordinance No. 1314.

Following enactment of these ordinances, Aladdin's entered into a ten year lease with Homart at a monthly rental of $2,433.75.[5] Aladdin's expended an additional $80,000 preparing its property for business.

In July 1976, after Aladdin's had spent or committed this sum in reliance upon the

WHEREAS, certain patrons of major shopping centers desire to leave their children unattended at coin–operated amusement establishments while shopping; and

WHEREAS, coin–operated amusement establishments have been and will be constructed that will accommodate same;

NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF MESQUITE, TEXAS:

*SECTION 1.* That Chapter 5–B, Section 7, of the City Code is hereby amended by adding the following, in all other respects to remain in full force and effect:

"Provided, however, that coin–operated establishments located in major shopping centers containing an enclosed mall and said establishments being operated only during the hours said mall is open and having no outside entrance and where said establishments does not offer for sale or allow the consumption of food, drink or other merchandise, the foregoing provision shall not be applicable and provided, further, that children under seven (7) must be accompanied by an adult."

**5.** Aladdin's began paying rent to Homart, Inc., in July 1976, and, apparently, continues doing so.

agreed legislative changes and in anticipation of doing business, the city manager refused to approve Aladdin's license application. At the time, he refused to explain his decision. Aladdin's later discovered that the city manager denied its application relying on conclusions drawn by the police chief that Aladdin's parent company, Bally Manufacturing Company, was part of the "mafia." The police chief's conclusions were based on his department's inquiry, which revealed that Bally and its president had been the subject of a federal indictment in Louisiana on charges of participation in racketeering and gambling activities. The department's investigation also established that Bally and its president had been acquitted of all charges.

The city manager cited ordinance No. 1103, amended in other respects by ordinance No. 1310, as authority for denying Aladdin's license. Ordinance No. 1103 permits the chief of police to make recommendations concerning the licensing of coin–operated amusement centers on the basis, *inter alia*, of "the applicant's character and conduct as a law abiding person and shall consider past operations, if any, convictions of felonies and crimes involving moral turpitude and *connections with criminal elements*." Ordinance No. 1103 (emphasis added).[6] According to the chief and the city manager, Aladdin's possessed connections with criminal elements, specifically the mafia, through its parent, Bally.

After receiving notice of the city manager's action, Aladdin's appealed to the city council. On August 16, 1976, the council voted to affirm the city manager's decision.[7]

On September 10, 1976, Aladdin's sued for injunctive relief in state court. On January 14, 1977, following trial, the court ruled that ordinance No. 1103 was impermissibly vague, general and indefinite under both the due process clause of the fourteenth amendment of the federal constitution and article 1, section 19 of the Texas constitution. Further, Mesquite was found to have exceeded its powers under article 11, section 5 of the Texas constitution and articles 1165 and 1175 of the Texas Revised Civil Statutes because it used vague and overbroad language. The state court also held that no substantial evidence supported the denial of a license to Aladdin's. Indeed, it found that neither Bally nor Aladdin's had any connection with the mafia or criminal elements. The court then ordered the city to issue Aladdin's a license immediately. The city issued the license on January 14, after accepting the required $100 filing fee. On January 20, 1977, the city gave notice of appeal.[8]

Aladdin's once again prepared to commence business on February 5, 1977. On February 7, however, the city passed ordinance No. 1353,[9] which repealed No. 1310

---

**6.** ORDINANCE NO. 1103

 *SECTION 2.* It is hereby declared to be unlawful to own, operate or maintain a coin–operated amusement establishment in the City without a license issued by the City of Mesquite therefor.

 Any person desiring to obtain a license for a coin -operated amusement establishment shall apply to the City Secretary by original and five (5) copies, one of which shall be routed to the City Manager, Chief of Police, Chief Building Inspector and City Planner, for review.

 The Chief of Police shall make his recommendation based upon his investigation of the applicant's character and conduct as a law abiding person and shall consider past operations, if any, convictions of felonies and crimes involving moral turpitude and connections with

criminal elements, taking into consideration the attraction by such establishments of those of tender years.

**7.** After learning that its license application had been denied, Aladdin's moved its equipment from the Town East Mall to another location. This move, as well as the expense of retaining the manager it had previously hired, cost Aladdin's an additional $5,000.

**8.** On appeal, the judgment of the district court was affirmed, *City of Mesquite v. Aladdin's Castle, Inc.,* 559 S.W.2d 92 (Tex.Civ.App.1977), *writ ref'd n.r.e.* 570 S.W.2d 377 (Tex.1978).

**9.** ORDINANCE NO. 1353

 *SECTION 1.* That Ordinance Number 1310 of the City of Mesquite passed on the 5th day of April, 1976, is hereby repealed.

and Aladdin's exemption under the seventeen year old age restriction of ordinance No. 1103. Ordinance No. 1353 included a new definition of "connection with criminal elements." [10] The city council thus reenacted the age restriction it had previously eliminated at Aladdin's request. The earlier contacts between Aladdin's and the city council indicate that the council knew that this change would clearly make Aladdin's Mesquite center unprofitable and force it to close. In short, Mesquite achieved the result denied it by the state court judgment.

Aladdin's then [11] sued in federal district court seeking injunctive relief to prohibit the city from enforcing ordinance No. 1353. Aladdin's asserted that the ordinance deprived it of various constitutional rights, including those of property and equal protection under both the federal and Texas constitutions. Aladdin's subsequently amended its complaint to include a challenge to the "connection with criminal elements" language, including the new definitional section added by ordinance No. 1353. Aladdin's especially contested the constitutionality of (1) the prohibition on the issuance of licenses for coin–operated amusement centers to anyone having a "connection with criminal elements," and (2) the age restriction on admission to such centers. On February 11, 1977, the court entered a temporary restraining order enjoining the ordinance's enforcement. After an evidentiary hearing, a preliminary injunction was entered on March 21, 1977. The case was then tried to the court on the merits. The court held that the language "connection with criminal elements," as amended by ordinance No. 1353, was unconstitutionally vague. It upheld the challenged age restriction, however, finding it to be rationally related to a legitimate state interest. *Aladdin's Castle, Inc. v. City of Mesquite*, 434 F.Supp. 473 (N.D.Tex.1977). Both parties appealed to this court.

## II. PRELIMINARY MATTERS

### A. *Subject Matter Jurisdiction*

The city challenges subject matter jurisdiction, claiming that the amount in controversy does not exceed $10,000. This contention misses the mark.

In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.... Here, that object is the right of [Aladdin's] ... to conduct their business affairs ... free from the interference of the challenged statute. The value of that right is measured by the losses that will follow from the statute's enforcement.

SECTION 5. It shall be unlawful for any owner, operator or displayer of coin–operated amusement machines to allow any person under the age of seventeen (17) years to play or operate a coin–operated amusement machine unless such minor is accompanied by a parent or legal guardian.

10. ORDINANCE NO. 1353

*Connection With Criminal Elements* is defined as that state of affairs wherein an applicant, or an officer of, principal stockholder of, person having a substantial interest in or management responsibility for, a corporation or other organization wherein such organization is the applicant, directly or as parent, subsidiary or affiliate, has such association, acquaintance, or business association with parties having been convicted of a felony or crime involving moral turpitude or are otherwise involved in unlawful activities, whether convicted or not, to the extent that the fencing of stolen merchandise or illegally obtained funds, the procurring [sic] of prostitutes, the transfer or sale of narcotics or illegal substances is made more feasible or likely or the protection of those of tender years from such unwholesome influences are rendered more difficult.

A determination by the United States Department of Justice that a party is a member of the "mafia" or "Cosa Nostro" family or that such party is engaged in or affiliated with a nationwide crime organization, whether formally or informally, shall be prima facia [sic] evidence, so far as the issuance of a license hereunder, that such person has "connections with criminal elements" and constitute, within the meaning of this ordinance, "criminal elements".

11. Aladdin's learned of the city's action reinstating the ordinance after the event, when a reporter called seeking its reaction. The city did, however, post a notice of consideration of the ordinance in its municipal building on February 4.

*Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977) (citations omitted). Aladdin's claims that it would suffer a $23,680 annual loss under the age restriction and that it would enjoy a $20,000 annual profit without it. The district court properly found jurisdiction.[12]

B. *Aladdin's Standing*

Invoking *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), the city claims that Aladdin's lacks standing to bring a void for vagueness challenge against the "connections with criminal elements" language of ordinance No. 1353. It argues that Aladdin's has not been injured; rather, Aladdin's complaint arises "from [its] less generalized yet speculative apprehensiveness that the [city] may at some future date misuse the information in some way that would cause direct harm to [Aladdin's]." *Id.* at 13, 92 S.Ct. at 2325 (footnote omitted). Aladdin's, it further asserts, does not complain that the city now refuses to issue it a license or that there will ever be a dispute involving the challenged language. *See Juidice v. Vail,* 430 U.S. 327, 331–33, 97 S.Ct. 1211, 1215–16, 51 L.Ed.2d 376 (1977).

■ This argument fails because it attempts to portray ordinance No. 1353 as a nonregulatory directive. In fact, the ordinance is regulatory and proscriptive. To obtain a license or to renew one, an applicant must seek the consent of five parties, including the chief of police. The chief's decision whether to give a positive or negative recommendation must, among other things, turn on the results of his investigation into "connections with criminal elements." Ordinance No. 1353 forces Aladdin's to attempt to conform its conduct to a vague standard in its license renewal applications for at least ten years or to suffer substantial pecuniary loss under its lease and in its investment in its leasehold. Aladdin's, therefore, has standing to challenge the "connections with criminal elements" language on vagueness grounds. *Laird v. Tatum,* 408 U.S. at 11, 92 S.Ct. at 2324 (plaintiff would have had standing if he "was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging").

■ Aladdin's also has standing to invoke the rights of various third parties.

> In this case, ... the statute ... inflicts on the vendor [Aladdin's] "injury in fact" that satisfies Art. III's case–or–controversy requirement, since "[t]he legal duties created by the statutory sections under challenge are addressed directly to vendors such as [[Aladdin's]. It] is obliged either to heed the statutory [prohibition], thereby incurring a direct economic injury through the constriction of [its] market, or to disobey the statutory command and suffer" legal sanctions. ... Therefore, [Aladdin's] is among the "vendors and those in like positions [who] have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function." ... As such, [Aladdin's] "is entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should [its] constitutional challenge fail."

*Carey v. Population Services International,* 431 U.S. 678, 683–84, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977) (citations omitted).

---

12. Jurisdiction exists under 28 U.S.C. §§ 1331, 1332. The city does not dispute the existence of diversity. It does argue, however, that a federal question has not been presented. We note in this regard that *Murphy v. California,* 225 U.S. 623, 32 S.Ct. 697, 56 L.Ed. 1229 (1912) and similar cases, *e. g., Phillips v. City of Atlanta,* 57 F.Supp. 588 (N.D.Ga.), *aff'd,* 145 F.2d 470 (5th Cir. 1944), are not authority for the proposition that a substantial federal question is never presented by any municipal regulation of a business conducting a public amusement.

*Murphy* does not say that a federal question is not presented if a city decides to regulate by void laws, irrational laws or laws violative of substantive constitutional rights such as due process or taking. Aladdin's is not challenging the city's general police power to regulate local businesses to promote the general welfare. The issue, instead, is whether the city employed a constitutionally permissible means or trammeled fundamental rights under the constitutions or laws of the United States and Texas.

## C. *Abstention*

■ Mesquite urges us to abstain because the vagueness issue was pending in state court when Aladdin's instituted its federal action. The city fails to recognize first, that Aladdin's originally brought its federal action to challenge Mesquite's seventeen year old restriction. This provision in the present ordinance was not before the state court because it was not adopted by the city until after it had lost on other grounds in state court. Second, the vagueness issue presented to the state court was different from the one presented to this court. Mesquite had passed the second "connection with criminal elements" ordinance with the new definitional section only after the state court invalidated its first ordinance. In the federal suit, Aladdin's challenged the constitutionality of legislation enacted after the state court proceedings commenced. Because no state proceeding based on this new legislation is pending, *see Doran v. Salem Inn, Inc.*, 422 U.S. 922, 930, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975), and because Aladdin's need not initiate another state proceeding which might provide a remedy, *see Lake Carriers' Assn. v. Mac-Mullan*, 406 U.S. 498, 509–10, 92 S.Ct. 1749, 1756–57, 32 L.Ed.2d 257 (1972), abstention is inappropriate. *See Concerned Citizens of Vicksburg v. Sills*, 567 F.2d 646, 650 (5th Cir. 1978).

## D. *Abuse of Discretion*

■ Mesquite claims that the district court abused its discretion in allowing Aladdin's to file its supplemental complaint raising the vagueness and overbreadth challenges. Mesquite contends that the court's decision put it in the position of going to trial unprepared or of allowing the preliminary injunction to remain in effect.

The district court has wide discretion over supplemental filings. Fed.R.Civ.P. 15(a). Mesquite could have requested a continuance to avoid prejudice. In any event, we find that the trial court did not abuse its discretion in permitting Aladdin's to amend its pleadings. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S.

321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

## III. SUBSTANTIVE MATTERS

### A. *Vagueness: "Connection with Criminal Elements"*

■ We agree with the district court that ordinance No. 1353's language, "connection with criminal elements," coupled with its definitional section and legislative policy section, *see* note 10 *supra*, is void for vagueness under the due process clause of the fourteenth amendment.

■ A law is void for vagueness if persons "of common intelligence must necessarily guess at its meaning and differ as to its application ...." *Smith v. Goguen*, 415 U.S. 566, 572 n.8, 94 S.Ct. 1242, 1246 n.8, 39 L.Ed.2d 605 (1974) quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See generally* Note, *The Void–for–Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L. Rev. 67 (1960). The offense to due process lies in both the nature and consequences of vagueness. First, vague laws do not give individuals fair notice of the conduct proscribed. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). *Accord Grayned v. City of Rockford*, 408 U.S. 104, 108 & n.3, 92 S.Ct. 2294, 2298 & n.3, 33 L.Ed.2d 222 (1972). Second, vague laws do not limit the exercise of discretion by law enforcement officials; thus they engender the possibility of arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. at 108–09 & n.4, 92 S.Ct. at 2298–99 & n.4; *Papachristou v. City of Jacksonville*, 405 U.S. at 168–70, 92 S.Ct. at 846–47. Third, vague laws defeat the intrinsic promise of, and frustrate the essence of, a constitutional regime. We remain "a government of laws, and not of men," *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 163, 2 L.Ed. 60 (1803) only so long as our laws remain clear.

■ The definition of "connection with criminal elements" in section 9 of ordinance

No. 1353 does not remedy the vagueness correctly found to exist by the state court. It refers to an "association, acquaintance, or business association" with undesirable parties "to the extent" that certain prohibited activities are made more likely "or the protection of those of tender years from such unwholesome influences are rendered more difficult." The nature of the improper associations or acquaintances is unspecified. Nor is it explained how an individual is to measure the extent to which these relationships might render protection of the young more difficult, or what degrees of "extent" and likelihood are barred. The ordinance fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. at 108, 92 S.Ct. at 2298. In *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), the Supreme Court struck down as unconstitutionally vague a statute applying to "a member of any gang." The present ordinance is equally vague and uncertain, and we hold that it violates due process.[13]

---

**13.** A law is void on its face for overbreadth if it "does not aim specifically at evils within the allowable area of [government] control but, . . . sweeps within its ambit other activities that in ordinary circumstances constitute an exercise" of protected expressive or associational rights. *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940). Under ordinance No. 1353, a license may be denied if an individual engaging in "apparently innocent activity" happens to associate with the wrong sort of person. *Sawyer v. Sandstrom*, 615 F.2d 311, 316 (5th Cir. 1980). In *Sawyer* we held that the "right to freely associate is not limited to those associations which are 'political in the customary sense' but includes those which 'pertain to the social, legal, and economic benefit of the [individuals who are associating].' *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965)." *Id.* Ordinance No. 1353 clearly and substantially attaches very serious consequences to, and seeks to deter, the exercise of protected associational activity. It is, therefore, overbroad and repugnant to due process. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975). *See generally Broadrick v. Oklahoma*, 413 U.S. 601, 612–13, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830

## B. *The Age Requirement*

The district court reviewed the age requirement of ordinance No. 1353 for constitutional purposes on a rational basis test. It noted that the facts of this case revealed only that:

> young people congregate at such amusement establishments, that several truancy arrests have been made at such centers (none at Plaintiff's establishment), and that in one instance a juvenile arrested for truancy at an amusement center was later found to be participating in the free school lunch program.

434 F.Supp. at 477. Observing that these were "incredibly slender reeds upon which to base [this] ordinance," *id.*, the court nevertheless upheld it. We cannot say with the district court that the ordinance's rational basis is "incredibly slender." Rather, the ordinance is "arbitrary and irrational." *Lindsey v. Normet*, 405 U.S. 56, 79, 92 S.Ct. 862, 877, 31 L.Ed.2d 36 (1972). We hold that the seventeen year old age requirement violates both the United States and Texas constitutional guarantees of due

---

(1973); *Thornhill v. Alabama*, 310 U.S. at 97–98, 60 S.Ct. at 741–42.

Even if ordinance No. 1353 has a legitimate purpose, the ordinance fails because less drastic alternative means of accomplishing that purpose exist. *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). The alleged purpose of ordinance No. 1353 is to ensure "that proper and suitable" persons operate amusement centers so as to protect children from "those who would promote gambling, sale of narcotics and other unlawful activities." Ordinance No. 1353. This purpose could also be achieved by narrowly drawn rules regulating nonassociational conduct. *Sawyer v. Sandstrom*, 615 F.2d at 317–18.

The section of the ordinance using identification by the Department of Justice as a test for "criminal elements" raises additional due process problems. Use of identification by the Attorney General as a test for Communist-front organization was struck down in *Dombrowski v. Pfister*, 380 U.S. 479, 494–96, 85 S.Ct. 1116, 1125–26, 14 L.Ed.2d 22 (1965), since there was no requirement that the organization be so identified only after compliance with proper procedural safeguards. The present Mesquite ordinance is equally lacking.

process of law,[14] and that the application of this age requirement to coin–operated amusement centers violates the federal and Texas constitutional guarantees of equal protection of the law.[15]

### 1. *Rational Basis*

■ Assuming that the rational basis test is the appropriate standard of review, we conclude that no such rationality supports ordinance No. 1353. The test requires that legislative action be rationally related to the accomplishment of a legitimate state purpose. First, the challenged legislation must have a legitimate public purpose based on promotion of the public welfare, health or safety. *See, e. g., Rinaldi v. Yeager,* 384 U.S. 305, 309–10, 86 S.Ct. 1497, 1499–1500, 16 L.Ed.2d 577 (1966); *Falfurrias Creamery Co. v. City of Laredo,* 276 S.W.2d 351 (Tex.Civ.App.1955, writ ref'd n. r. e.). Second, the act taken must bear a rational relation to the end it seeks to further. *See, e. g., Griswold v. Connecticut,* 381 U.S. at 505–07, 85 S.Ct. at 1693–94 (White, J., concurring); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957); *City of University Park v. Benners,* 485 S.W.2d 773, 778–79 (Tex.1972), *appeal dismissed* 411 U.S. 901, 93 S.Ct. 1530, 36 L.Ed.2d 191 (1973).

The requirement of legislative rationality in the service of legitimate purposes protects individuals and their liberties from official arbitrariness or unthinking prejudice. As one commentator noted, irrationality at least means "patently useless in the service of any goal apart from whim or favoritism." Michelman, *Politics and Values or What's Really Wrong with Rationality Review?* 13 Creighton Law Review 487, 499 (1979). The test requires that legislation constitute a means that is "reasonable, not arbitrary and rests 'upon some ground

of difference having a fair and substantial relation to the object of the legislation ….'" *Texas Woman's University v. Chayklintaste,* 530 S.W.2d 927, 928 (Tex. 1979), citing *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). *Accord, United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *James v. Strange,* 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

■ Examination of ordinance No. 1353 reveals two stated purposes. First, the ordinance seeks to prevent truancy. Second, it seeks to keep minors from being exposed to people "who would promote gambling, sale of narcotics and other unlawful activities." We conclude that the seventeen year old age requirement in no way rationally furthers these interests in regulating the associational activity of Mesquite's young citizens, even making the assumption that both of these goals are legitimate.

### (a) *Truancy*

The decision to bar all people under seventeen years of age, whether or not they are required to be in a school, Tex.Educ. Code Ann. §§ 21.032, 21.033 (Vernon) (1972 & Supp.1980), from all coin–operated amusement centers at all times is patently irrational. *See, e. g., Stanley v. Illinois,* 405 U.S. at 652–59, 92 S.Ct. at 1213–1216. Barring young people from using coin–operated amusement devices at times and on days when school is closed simply bears no relation whatever to the city's alleged interest in eliminating truancy. *See Eisenstadt v.*

---

**14.** "[N]or shall any State deprive any person of life, liberty, or property, without due process of law …." U.S.Const. amend. XIV, § 1. "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex.Const. art. I, § 19.

**15.** "[N]or shall any State … deny to any person within its jurisdiction the equal protection of the laws." U.S.Const. amend. XIV, § 1. "All free men, when they form a social compact, have equal rights …." Tex.Const. art. I, § 3.

*Baird*, 405 U.S. at 447–52, 92 S.Ct. at 1035–1037 (contrived purpose evidenced by irrationality). The regulation instead evidences the city's disapproval of such centers in general or of Aladdin's owners in particular. *See Orr v. Orr*, 440 U.S. 268, 280 n.10, 99 S.Ct. 1102, 1112 n.10, 59 L.Ed.2d 306 (1979). Such disapproval may justify private action, such as the withholding of patronage, but mere disapproval is not enough constitutionally to justify bringing the full weight of the municipality's regulatory apparatus into play.

■ By the same token, the regulation denies Aladdin's equal protection of the laws. Just as the "all hours" restriction is grossly overinclusive, the limitation of that restriction to coin–operated amusement centers is equally underinclusive. Before such centers existed, children found places and opportunities for truancy, and they would find places were such centers to become extinct. Singling out coin–operated amusement centers from all other establishments is an act of discrimination, not policy.

> Traditional equal protection analysis does not require that every classification be drawn with precise " 'mathematical nicety.' " ... But the classification here in issue is not only "imprecise," it is wholly without any rational basis.

*United States Department of Agriculture v. Moreno*, 413 U.S. at 538, 93 S.Ct. at 2827 (citation omitted).

### (b) *Exposure to Corrupting Influences*

The record is entirely devoid of evidence that a person under seventeen years of age has been exposed to a person "who would promote gambling, [the] sale of narcotics and other unlawful activities" while in a coin–operated amusement center in Mesquite. The district court recognized, as we do, that the city presented no evidence that such people ever come to these centers. Initially, therefore, we note that the city failed to demonstrate any need which would give rise to an interest in protecting its young citizens from corrupt influences in amusement centers.

If such people do go to the centers, there is no evidence that they are drawn by the machines. They are instead drawn by the presence of those whom they perceive of as potential victims. The city did not show that barring children from these centers would in any way stop these people from associating with children. Logic indicates that they would merely follow the barred children to other places of congregation such as the schoolyard, the nearby street corner, the movies, the local fast food establishment, the parking lot, the concert, the park, or the beach. The city's regulation thus does not even further its stated goal of protecting minors from exposure to malefactors. *Cf., Eisenstadt v. Baird*, 405 U.S. at 442 n.3, 92 S.Ct. at 1033 n.3 (legislation "has no deterrent effect"). Mesquite's goal of keeping minors from being exposed to undesirable people could not, therefore, be served by an absolute ban on access to coin–operated amusement centers, unless such a ban were accompanied by bans on access to every other place of congregation. Certainly such an approach would impermissibly destroy freedom. If a malefactor is to be precluded from malefaction, the city must bar the act or must seek to educate potential victims and perpetrators. *Whitney v. California*, 274 U.S. 357, 378, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). Barring association in places, on the other hand, does not permissibly further an end of precluding conduct which might occur in those places. *Cf. Medora v. Colautti*, 602 F.2d 1149, 1155 n.14 (3d Cir. 1979) ("Just as the intentional harming of a group is not a legitimate goal, so too the intentional harming of a group to further some other governmental interest in not a rational means to further that other interest"). A grossly overinclusive and irrational ban will not pass constitutional muster. *F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920). As the city must acknowledge, the supposed evil does not inhere in mere simultaneous presence.[16]

**16.** Mesquite relies on *Murphy v. California*, 225 U.S. 623, 32 S.Ct. 697, 56 L.Ed. 1229 (1912), as authority for the proposition that municipalities are much less restrained by the constitu-

### 2. Strict Scrutiny

■ Even if the challenged ordinance had a rational basis and a legitimate purpose, we would nevertheless be compelled to strike it down. The challenged age restriction impermissibly trammels fundamental personal rights. By its actions, Mesquite has denied individuals under seventeen years of age their liberty interests in association. Since this denial neither furthers "a sufficiently important interest [nor] employs means closely drawn to avoid unnecessary abridgement of associational freedoms," *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976), the ordinance is unconstitutional.

### (a) Association

■ The right of association is fundamental. *See, e. g., Richmond Newspapers Inc. v. Virginia*, —— U.S. ——, ——, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980) (plurality opinion); *NAACP v. Button*, 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963); *Sotto v. Wainwright*, 601 F.2d 184, 191 (5th Cir. 1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980). The right to associate freely and " 'to go where one pleases' " is a protected freedom under the first amendment and a substantive guarantee of fourteenth amendment due process. *Sawyer v. Sandstrom*, 615 F.2d at 316 (quoting *Bykofsky v. Borough of Middletown*, 401 F.Supp. 1242, 1254 (M.D.Pa.1975), *aff'd*, 535 F.2d 1245 (3rd Cir.), *cert. denied*, 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976)); *see Sotto v. Wainwright*, 601 F.2d at 190–91. The right of free association protects associational activities directed at a plethora of ends, *Griswold v. Connecticut*, 381 U.S. at 483, 85 S.Ct. at 1681; *Sawyer v. Sandstrom*, 615 F.2d at 316, including political, *e. g., Buckley v. Valeo*, 424 U.S. at 22, 96 S.Ct. at 636, economic, *UMW v. Illinois State Bar Association*, 389 U.S. 217, 221–25, 88 S.Ct. 353, 355–57, 19 L.Ed.2d 426 (1967), familial, *e. g., Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion), intimate, *e. g., Griswold v. Connecticut*, 381 U.S. at 486, 85 S.Ct. at 1682; *see* Karst, *The Freedom of Intimate Association*, 89 Yale L.J. 624 (1980); *see generally* Raggi, *An Independent Right to Freedom of Association*, 12 Harv.C.R.–C.L. L.Rev. 1 (1977). The Supreme Court has never ruled directly on the application of the right of association in a social context such as the present one. However, the Court in dicta has endorsed a right of social association, *Gilmore v. City of Montgomery*, 417 U.S. 556, 575, 94 S.Ct. 2416, 2427, 41 L.Ed.2d 304 (1974) (quoting *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 179–80, 92

---

tion when they regulate public amusements than when they regulate ordinary businesses. This aspect of *Murphy*, however, is no longer good law. *Murphy* rested its distinction on the theory that "the law does not prevent the municipal authorities from taking legislative notice of the idleness and other evils which result from the maintenance of a resort [for amusement] ...." *id.* at 629, 32 S.Ct. at 698. This view of idleness has been rejected by the Supreme Court:

> All loitering, loafing, or idling ... is not necessarily detrimental to the public welfare .... It may be and often is entirely innocuous.

*Papachristou v. City of Jacksonville*, 405 U.S. 156, 157 n.2, 92 S.Ct. 839, 841 n.2, 31 L.Ed.2d 110 (1972) (quoting *Lazarus v. Faircloth*, 301 F.Supp. 266, 272 (S.D.Fla.1969)); *see generally Coates v. City of Cincinnati*, 402 U.S. 611, 615–16, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971). Today, *Murphy* stands only for the proposition that

The States have the power to make a morally neutral judgment that [some activity] has a tendency to injure the community as a whole, to endanger the public safety, or to jeopardize, in Mr. Chief Justice Warren's words, the States' "right ... to maintain a decent society." *Jacobellis v. Ohio*, 378 U.S. [184] at 199, 84 S.Ct. 1676 at 1684, 12 L.Ed.2d 793 [1964] (dissenting opinion).

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 69, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973). As we have already shown, Mesquite's ordinance is simply not rationally related to this legitimate purpose. Even *Murphy* rejects ordinances when

> looking through mere forms and at the substance of the matter, ... the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law.

*Murphy v. California*, 225 U.S. at 630, 32 S.Ct. at 699 (citation omitted).

S.Ct. 1965, 1974, 32 L.Ed.2d 627 (1972) (Douglas, J., dissenting)), and this circuit has held that even associating on street corners is "constitutionally protected conduct," *Sawyer v. Sandstrom*, 615 F.2d at 317; *cf. Robinson v. Reed*, 566 F.2d 911, 913 (5th Cir. 1978) (public employee could make constitutional claim if required to disclose facts about home life or associations). These precedents control the present case.

 Restraining association is therefore not a legitimate governmental purpose, absent a compelling state interest to warrant such restraint. Regulations affecting fundamental rights of association, but aimed at nonassociational evils, are allowable under certain circumstances. To be constitutional, however, the regulation must at least be nondiscriminatory, must not "unnecessarily burden or restrict constitutionally protected activity," *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972), must be drawn with "[p]recision," *NAACP v. Button*, 371 U.S. at 438, 83 S.Ct. at 340, must be "tailored," *Shapiro v. Thompson*, 394 U.S. 618, 631, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969), to accomplish its legitimate objectives, and must not be the most restrictive method of regulation if other, "less drastic means" are available, *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

### (b) *Regulation of Minors*

 We do not doubt that the state may have a legitimate interest in protecting young people from certain unhealthy influences. Yet "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.". *NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 1313, 12 L.Ed.2d 325 (1964); *Sawyer v. Sandstrom*, 615 F.2d at 316 (association as one such protected freedom).

Mesquite's interest in shielding young people from undesirable influences may be

achieved in other ways. Activities such as gambling with children or selling them drugs can be criminalized and vigorously prosecuted.[17] The ordinance before us, however, sweeps too broadly and cannot be justified under our Constitution. "[T]he deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech and assembly." *Whitney v. California*, 274 U.S. 357, 378, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).

The standard that the ordinance must meet is not reduced because minors are involved. "A child, merely on account of his minority, is not beyond the protection of the Constitution." *Bellotti v. Baird* 443 U.S. 622, 633, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797 (1979) (Powell, J., joined by Burger, C. J. & Stewart & Rehnquist, JJ.). Minors "are possessed of fundamental rights which the State must respect." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). "[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967). *Accord, Planned Parenthood v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976). *See generally Developments in the Law—The Constitution and the Family*, 93 Harv.L.Rev. 1156, 1358–77 (1980).

 In some cases to be sure, the state may have greater power to regulate conduct that is otherwise constitutionally protected if the regulation applies only to children. This "somewhat broader authority to regulate the activities of children than adults," *Planned Parenthood v. Danforth*, 428 U.S. at 74, 96 S.Ct. at 2843, is warranted only if a special circumstance of youth creates a unique danger to minors which presents the state with an interest in regulating their activities that does not exist in the case of adults. *Ginsberg v. New York*,

---

17. We do not intimate by our holding that Mesquite cannot appropriately restrict minors in connection with establishments which dispense alcoholic beverages or illicit drugs.

390 U.S. 629, 638–41, 88 S.Ct. 1274, 1279–81, 20 L.Ed.2d 195 (1968); *Prince v. Massachusetts*, 321 U.S. 158, 169–70, 64 S.Ct. 438, 443–444, 88 L.Ed. 645 (1944). Control and restraint by the state, which would otherwise be intolerable under our Constitution, may be justified if the regulation serves a " 'significant state interest . . . that is not present in the case of an adult,' " which arises from the fact of youthful vulnerability to harm. *Carey v. Population Services International*, 431 U.S. 678, 693, 97 S.Ct. 2010, 2020, 52 L.Ed.2d 675 (1977) (citing *Planned Parenthood v. Danforth*, 428 U.S. at 75, 96 S.Ct. at 2843).

In *Bellotti v. Baird*, 443 U.S. at 633–39, 99 S.Ct. at 3035–46, Justice Powell set out for himself and three other Justices three reasons which in some circumstances might permit the state to restrain minors in a way which would be unconstitutional if applied to adults:

> the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child–rearing.

*Id.* at 634, 99 S.Ct. at 3043. These reasons may be viewed as threshold criteria. If Mesquite's ordinance were based on any of them, we would be required to determine the strength of the support provided, its relation to the ordinance as a whole, and the extent, if any, to which it might serve to justify any special restraints on the associational rights of minors. Neither the Supreme Court nor this circuit has set forth the appropriate standards under which such an inquiry would be conducted. We need not undertake to resolve this matter here, since none of Justice Powell's factors even remotely apply to the present ordinance.

██ There is no issue of special vulnerability presented in this case. Justice Powell limited his discussion of this factor to juvenile criminal proceedings, where the special needs of children have served as a basis for distinguishing certain aspects of procedural due process from adult cases. *Compare In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) *with McKeiver v. Penn-*

*sylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). Even extending the vulnerability rationale to its broadest extent, it is impossible to conclude that a coin–operated amusement device presents a physical, mental, or moral threat under which "the State is entitled to adjust its legal system to account for children's vulnerability and their needs for 'concern, . . . sympathy, and . . . paternal attention.' " *Bellotti v. Baird*, 443 U.S. at 635, 99 S.Ct. at 3044, citing *McKeiver v. Pennsylvania*, 403 U.S. at 550, 91 S.Ct. at 1988 (plurality opinion). That Mesquite may disapprove of Aladdin's Castle is hardly a sufficient justification for invoking "the peculiar vulnerability of children." Associations "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14, 95 S.Ct. 2268, 2274–75, 45 L.Ed.2d 125 (1975).

The irrelevance of the "critical decision" rationale is manifest on its face. To suggest that minors be permitted to express their views on divisive public issues, *Tinker v. Des Moines Independent School District*, and to secure abortions without parental consent, *Bellotti v. Baird, Planned Parenthood v. Danforth*, but that they can be barred from making the "critical decision" of whether or not to deposit a quarter in a coin–operated amusement device is not a proposition that deserves serious consideration.

As for Justice Powell's third element, the role of parents, clearly this concern militates against the ordinance, not for it. Even if youthfulness is relevant in the case before us, parents, not the state, should decide whether their children are to enter coin–operated amusement centers. The state may not burden parents who decide to allow their children to enter. the centers by requiring these parents to accompany their children. If a parent would rather shop or work and decides to trust Aladdin's personnel or the child, that is the parent's prerogative.

The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

*Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972). *Accord, Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979). Thus for minors as for adults, the ordinance impermissibly and unconstitutionally infringes on freedom of association.

### 3. *Concluding Remarks*

Aside from the constitutional issues we have already considered, we note that the record before us presents a very unpleasant story. We suggest, although we do not decide, that there are limits on the powers of municipalities to induce businessmen to expend vast sums of money, then, without any changed circumstances, to enact legislation which destroys the value of that expenditure. This is especially true if (1) the business, acting in good faith and with full disclosure, informs the municipality of its plans, (2) the municipality encourages the business in a significant manner, such as by amending existing legislation, (3) the business detrimentally relies on that encouragement, and (4) no conditions, including the composition of the city council and the local political climate, have changed. In this case, Aladdin's knew that it was not guaranteed a license, but Aladdin's could not know that the city would reinstate its age restriction immediately after Aladdin's had undertaken substantial expenditures and contractual commitments. Aladdin's could only anticipate enforcement of the "connection with criminal elements" provision. Given our disposition of this case on other grounds, we need not decide whether Mesquite's actions exceed any constitutional restraint such as takings, contract impairments or due process. We should not, however, be understood as expressing tacit approval of Mesquite's actions in this matter.

Our dissatisfaction with this situation, however, extends beyond the specific incidents of this case to the entire approach to governmental regulation of personal liberty of which Mesquite's ordinance is but a sample. We certainly have no wish to challenge the legitimacy of many, even most of the statutes, ordinances and regulations issued by the innumerable legislatures and agencies in our modern and complex society. The era of *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), is happily long ended. Nevertheless, recognition of the multiple problems and needs of our contemporary world does not oblige us to discard the basic principles of constitutional government to which we have always been committed.

> The purpose of the Constitution and Bill of Rights ... was to take government off the backs of people .... This is the philosophy of Jefferson that "[t]he opinions of men are not the object of civil government, nor under its jurisdiction .... [I]t is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order ...."

*Schneider v. Smith*, 390 U.S. 17, 25, 88 S.Ct. 682, 686, 19 L.Ed.2d 799 (1968) (quoting *A Bill for Establishing Religious Freedom*, Jeffersonian Cyclopedia 976 (1900)).

The original documents on which our law is based contain stated concerns about the necessary diffusion of power—separating, dividing and checking governmental powers. The framers created limits on government and, concomitantly, a realm within which individuals and groups could function with autonomy. This realm need not have been defined exhaustively by specific guarantees; its parameters were defined indirectly by the constraints placed on government and the recognition that these rights were to be available to all equally. Over time we have recognized that governmental power must not be too diffuse, but we have also seen that the changes mandated by this recognition need not stand at odds with our constitutional commitment to personal autonomy, if we merely articulate what is implicit in our law.

As Chief Justice Burger has recently reminded us,

> [C]ertain unarticulated rights are implicit in enumerated guarantees. For example, the rights of association and of privacy, the right to be presumed innocent and the right to be judged by a standard of proof beyond a reasonable doubt in a criminal trial, as well as the right to travel, appear nowhere in the Constitution or Bill of Rights. Yet these important but unarticulated rights have nonetheless been found to share constitutional protection in common with explicit guarantees.... [F]undamental rights, even though not expressly guaranteed, have been recognized ... as indispensable to the enjoyment of rights explicitly defined.

*Richmond Newspapers, Inc. v. Virginia,* —— U.S. at ——, 100 S.Ct. at 2829 (Burger, C. J., plurality opinion joined by Stevens & White, JJ.) (footnotes omitted). We have reached a similar conclusion on numerous occasions. *See e.g., Sotto v. Wainwright,* 601 F.2d 184, 190–91 (5th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980); *St. Ann v. Palisi,* 495 F.2d 423, 425 (5th Cir. 1974). Doctrinally, this recognition of fundamental liberties derives in part from the ninth amendment, *Richmond Newspapers, Inc. v. Virginia,* —— U.S. at —— n.15, 100 S.Ct. at 2829 n.15 (plurality opinion); *Stanley v. Illinois,* 405 U.S. at 651, 92 S.Ct. at 1212; *Griswold v. Connecticut,* 381 U.S. at 488–93, 85 S.Ct. at 1683–84 (Goldberg, J., concurring, joined by Warren, C. J. & Brennan, J.), in part by due process, *Moore v. City of East Cleveland,* 431 U.S. 494, 501–03, 97 S.Ct. 1932, 1936–37, 52 L.Ed.2d 531 (1977) (plurality opinion); *Meachum v. Fano,* 427 U.S. 215, 230, 96 S.Ct. 2532, 2541, 49 L.Ed.2d 451 (1976) (Stevens, J., dissenting); *Griswold v. Connecticut,* 381 U.S. at 501, 85 S.Ct. at 1690 (Harlan, J., concurring), and in part from the basic principles of our system, *Richmond Newspapers, Inc. v. Virginia,* —— U.S. at ——, 100 S.Ct. at 2828–29 (plurality opinion); *Nevada v. Hall,* 440 U.S. 410, 432–34, 99 S.Ct. 1182, 1194–95, 59 L.Ed.2d 416 (1979) (Rehnquist, J., dissenting); *San An-*

*tonio Independent School District v. Rodriquez,* 411 U.S. 1, 102–03, 93 S.Ct. 1278, 1332, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting). Whatever the source, all go to support "[t]he fundamental theory of liberty upon which all governments in this Union repose." *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925).

Liberty must be examined as a principle or commitment, if we are to avoid "the tyranny of labels," which Mr. Justice Cardozo characterized as "[a] fertile source of perversion in constitutional theory." *Snyder v. Massachusetts,* 291 U.S. 97, 114, 54 S.Ct. 330, 335, 78 L.Ed. 674 (1934). *Accord, Doe v. Bolton,* 410 U.S. 179, 210–11, 93 S.Ct. 739, 757, 35 L.Ed.2d 201 (1973) (Douglas, J., concurring) (the specific liberty interests found implicit in the liberty guaranteed by the fifth and fourteenth amendments elaborate "the Blessings of Liberty" promised in the Constitution's preamble). Liberty stands for the idea that the government exists to serve the individual, not that the individual exists to be subservient to government or to a majority that controls government. The idea of liberty rejects governmental regimentation encompassing virtually every facet of the citizen's life. *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). Our governmental system is "built upon postulates of respect for the liberty of the individual." *Poe v. Ullman,* 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). *See, e.g., Moore v. City of East Cleveland,* 431 U.S. at 503, 97 S.Ct. at 1937 (Powell, J., plurality opinion).

> "[L]iberty" ... is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective.

*Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954).

That we are dealing with minors here does not alter our conclusions.

In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any Legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution.

*Meyer v. Nebraska*, 262 U.S. 390, 402, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923).

It is not the courts alone who are bound to safeguard these freedoms. Executives and legislature, from the nation's capital to the smallest village, and most of all the people themselves, are called upon by our Constitution to respect, enforce and cherish these principles of liberty and personal autonomy.

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, *the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.*

*Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) (emphasis added).

In summary, we affirm the district court's holdings that jurisdiction exists, and that the portion of ordinance 1353 using and defining the term "connection with criminal elements" is void for vagueness. On the seventeen year old age requirement of the ordinance, we reverse, holding that it is constitutionally offensive and that plaintiff is entitled to the injunctive relief sought. We remand in order that the district court may modify its judgment to that effect.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.